UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-22590-CIV-HOEVELER

KATHY EMERY,

       Plaintiff,

v.

AMERICAN AIRLINES, INC.,
a foreign corporation,

       Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, IN PART, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, IN PART

THIS CAUSE comes before the Court on the parties' motions for summary judgment and Plaintiff's motion for leave to file newly acquired evidence. The Court has reviewed the parties' arguments and evidence - including the supplemental briefs, and has reviewed pertinent portions of the file; based on that review, the Court finds that Plaintiff has not established that she is entitled to reinstatement of disability benefits. The Court has concluded, however, that a civil penalty shall be imposed against Defendant for the failure to timely provide a copy of the subject pension plan to Emery.[1]

---

[1] As to Plaintiff's claim for "other equitable relief" in Count III of the Complaint, the record reflects that Plaintiff abandoned that claim. See Transcript of oral argument, ECF No. 169, p. 42. The Court also has determined that Plaintiff is not entitled to attorneys' fees (as requested in Count IV of the Complaint).

## BACKGROUND

This lawsuit was filed pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., on September 18, 2008, seeking to recover benefits pursuant to the American Airlines, Inc., Pilot Retirement Benefit Program (the "Plan"). Plaintiff Emery was employed by Defendant as an airline pilot and eligible to participate in the benefits of the Plan.

The Plan[2] provides retirement, disability, and related benefits to eligible pilots and their beneficiaries and is an employee benefit plan subject to ERISA. Benefits awarded under the Plan are funded by payments from a trust, which American Airlines funds through yearly contributions; while such payments are not eligible to be refunded to American Airlines, future required contributions may be reduced in the event that a participating member of the Plan (i.e., an employee) dies or their right to benefits is forfeited. AA38.[3] The Plan is administered by American Airlines, and also by a Pension Benefits Administration Committee ("PBAC") created by American Airlines, as described in more detail, below.

––––––––––––––––––––

[2]The parties have submitted for the Court's review a copy of the Plan which includes all amendments up to the Seventh Amendment, executed on December 20, 2006. See ECF No. 108-15, p. 11. Unless otherwise stated, all references to the Plan herein are to the version amended up to and including the Seventh Amendment.

[3]Throughout this Order the Court has referenced the designated pages of the Plan according to the numbers found on the documents submitted in the parties' joint notice of filing the Plan, at ECF No. 108, and the parties' joint notice of filing the administrative record, at ECF No. 109, unless otherwise noted. For example, at ECF No. 108-4, p. 6 of 11, the document bears the number "AA000038" at the bottom right corner, and this Court, accordingly, has referenced AA38.

From March 18, 2003, until January 25, 2007, Emery received long term disability benefits from Defendant as a result of her suffering from depression and performance anxiety; in early 2007 Emery's benefits were terminated when Defendant determined that "verification of [Emery's] continued disability and necessity of continued medical treatment cannot be established." AA541. Emery administratively appealed that decision and the appeal was submitted to an independent clinical authority, Western Medical Evaluators ("WME"), which had been jointly selected by Defendant and the pilots' union to handle such disputes. As the pilots' union and American Airlines had agreed that the medical opinions of WME would be final and binding, the PBAC was bound to accept WME's ultimate determination that Emery had not submitted evidence that she was disabled. After the denial of her appeal by the PBAC, Emery then filed this action.

This Court heard oral argument on the parties' cross-motions for summary judgment on March 23, 2011.[4]

## STANDARD OF REVIEW

The Eleventh Circuit has adopted a six-step test for the review of ERISA disputes:

---

[4]After Defendant filed a notice that it had filed a voluntary petition for bankruptcy protection in November 2011, the case was stayed automatically and subsequently dismissed without prejudice. After the bankruptcy was completed, the case was reopened on January 10, 2014. As this Court already has heard oral argument, Plaintiff's new motion for oral argument is DENIED.

3

1. Apply the *de novo* standard of review to determine whether the Administrator's decision to deny benefits was "wrong" (i.e., the court disagrees with the conclusion); if it is not, then end the inquiry and affirm the decision.

2. If the Administrator's decision is wrong, then determine whether the Administrator had discretion in reviewing claims; if not, then end the inquiry and reverse the decision.

3. If the Administrator's decision is wrong, and the Administrator was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported the decision (i.e., review the decision under the deferential "arbitrary and capricious" standard).

4. If no reasonable grounds exist for the decision, then end the inquiry and reverse the Administrator's decision; if reasonable grounds do exist, then determine whether the Administrator operated under a conflict of interest.

5. If there is no conflict of interest, then end the inquiry and affirm the decision.

6. If there is a conflict of interest, the conflict is merely a factor for the court to consider when determining whether an Administrator's decision was arbitrary and capricious.

Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1355 (11th Cir.), *cert. denied*, 132 S. Ct. 849 (2011).

In this case, the Plan specifies that its Administrator is American Airlines.[5] In addition, the Plan establishes the PBAC, appointed pursuant to Section 11.3 of the Plan, which has the power to "administer the claims appeal procedures of the

---

[5]Article II, Section 2.1(h) of the Plan defines "Administrator" as the "Company," which is defined as American Airlines, Inc., at Section 2.1(z). In addition, at Section 11.1 (as amended by the Fifth Amendment to the Plan), the Plan states that the Company has the "responsibility and authority to control the operation and administration of the Plan ...."

Plan." Plan, § 11.3(c)(v) (as amended by the Fifth Amendment[6]).[7]  The Plan

provides that American Airlines is the Administrator with "responsibility and

authority to control the operation and administration of the Plan, <u>except to the</u>

<u>extent such responsibility and authority has specifically been assigned herein to</u>

<u>[the PBAC]</u>." Plan, § 11.1 (as of the Sixth Amendment to the Plan, adopted

December 20, 2006) (emphasis added).  In other words, as acknowledged by the

parties, the Plan grants discretion to the Administrator (American Airlines) to

decide claims and grants the PBAC (as assigned by American Airlines) discretion to

review claims on appeal.

In light of this grant of discretion, even if the Court finds that the decision to

deny benefits to Emery was "wrong," (step one of the relevant test) the Court will

not disturb that decision if the record reveals a reasonable basis for that decision

(step three of the test), unless the Court determines that a conflict of interest was

present (step four) and that the decision was arbitrary and capricious (step six).[8]

Emery bears the burden of establishing that the Defendant's decision - whether or

---

[6]Relevant pages of the Plan which include the version of Section 11.3, as amended by the Fifth Amendment, are found at ECF No. 108-14, AA144A-145.

[7]The Plan grants to the PBAC the authority to "decide questions concerning the application or interpretation of the Plan ... including but not limited to determinations of eligibility for benefits." Plan, § 11.3(c)(iii) (as amended by the Fifth Amendment).

[8]An Administrator's benefits decision is not "arbitrary and capricious" if it has a "reasonable basis" in the material available to the administrator at the time of the decision. <u>Blankenship</u>, 644 F.3d at 1354.

not the decisionmaker operated under a conflict of interest - was arbitrary and capricious.

The Court has, for the purposes of analysis, assumed that the decision by American Airlines to discontinue Emery's benefits was wrong; as such, and in light of the clear evidence that the Administrator (American Airlines or PBAC) had discretion in reviewing claims, the Court proceeds directly to the question of whether there exist reasonable grounds for the Administrator's decision, i.e. the Court proceeds to the third step of the test adopted in this Circuit.  In making my determination, I am limited to reviewing the evidence in the administrative record,[9] unless specific evidence as to a conflict of interest is presented,[10] and I must uphold the Plan's decision if there is a reasonable basis for the Plan's denial of benefits,

---

[9]The Court is limited to the record that was before the administrator when it made its decision.  Glazer v. Reliance Std. Life Ins. Co., 524 F.3d 1241 (11th Cir. 2008), citing Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989).

[10]Limited discovery beyond the administrative record may be permissible in certain cases to determine what is the appropriate standard of review to apply, or to assist the court in determining whether a plan administrator operated under a conflict of interest.  For example, it may be permissible for a plaintiff to seek evidence in order to define the contents of the administrative record, Cerrito v. Liberty Life Assurance Co., 209 F.R.D. 663, 664 (M.D. Fla. 2002), or whether the administrator makes both eligibility decisions and pays benefits out of its own funds, or whether the administrator deviated from its own claims practices, Bloom v. Hartford Life & Accident Ins. Co., 917 F. Supp. 2d 1269, 1276-79 (S.D. Fla. 2013), etc.  Plaintiff in this case was permitted to conduct some discovery, see Order granting, in part, Plaintiff's motion to compel, ECF No. 70, and she has submitted deposition testimony and other evidence, which the Court has reviewed.

even if there is evidence supporting a contrary result.[11]

<u>Was there a conflict of interest?</u>

Before addressing the question of whether the decision was based on reasonable grounds, the Court has examined whether or not Plaintiff has established that Defendant operated under a conflict of interest.  While this may appear to be a departure from the enumerated steps of the governing test, i.e., a casual observer might suggest that the Court has skipped step three, instead this approach has the benefit of allowing the Court - if Emery has proven[12] that a conflict exists - to examine the evidence in the first instance with careful attention to whether any bias or conflicted interest might have affected the decision.[13]

Although Plaintiff's attorneys claim that "[r]arely is evidence of bias and self-interest seen as blatant as it is in this case," ECF No. 119, p. 20, the Court disagrees.  Plaintiff's accusations of bias are directed solely at Dr. Thomas Bettes, the Manager of Occupational Health Services (also referred to as the Medical

---

[11]A Plan administrator is free to deny a claim based on conflicting evidence, where that evidence is reliable.  <u>Oates v. Walgreen Co.</u>, 2014 U.S. App. LEXIS 15525 (11th Cir. Aug. 13, 2014) (citing <u>Oliver v. Coca Cola Co.</u>, 497 F.3d 1181, 1199 (11th Cir.), *vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007)).

[12]At each step of the applicable test, the burden of proof remains firmly on the plaintiff to demonstrate that the decision was arbitrary and capricious.  <u>Doyle v. Liberty Life Assurance Co.</u>, 542 F.3d 1352, 1360 (11th Cir. 2008).

[13]To be clear, the Court has not skipped a step of the test - in the final analysis, I have evaluated all of the evidence to determine whether reasonable grounds supported the Defendant's decision.

Director) for American Airlines.  Dr. Bettes was responsible for adjudicating

Emery's initial application for disability benefits - which he approved in July 2003.[14]

Plaintiff rests her allegations of bias on strained interpretations of

statements made by Dr. Bettes. For example, Emery points to an email dated June

17, 2003, from Dr. Bettes to two employees of American Airlines, related to a

request for a psychologist to refer to Emery.  In that message, Dr. Bettes wrote that

the reference being requested was for:

> a female pilot ... who is unable to complete mandatory upgrade training and
> who needs a very limited course of counseling for performance anxiety and
> minor depression before she is released to return to her training.  This
> employee is extremely uncooperative and difficult to work with and we need
> to make sure she does not end up on a long-term [sick leave of absence] (we
> need to have a good working relationship with the provider).

AA1019 (found in ECF No. 122-3).  One month later, Dr. Bettes noted that it would

be the responsibility of his department "to carefully manage and monitor [Emery] to

ensure the goal remains to improve and eventually be cleared rather than to remain

on disability....  I will make this case a priority to hopefully ensure it does not

become a costly permanent medical disability case." AA1117.  In that same

message he noted that Emery would "need to apply for and be administratively

approved for [disability benefits] but as long as she is fully compliant with the

treatment I would have to medically certify."  AA1116.  These comments and

---

[14]In July 2003 Dr. Bettes approved Emery's initial request for disability
benefits.  AA496.

others[15] - from several years prior to the final determination to deny Emery's appeal - when read in their context, are not sufficient proof on their own that the decision making process was arbitrary or capricious. However, as described below, the Court has evaluated all of the evidence to determine whether any alleged bias by Dr. Bettes against Emery infected these proceedings to such extent that reversal of Defendant's decision is required.

As to the alleged self-interest or structural conflict of interest, i.e., the allegation that the Plan's structure presented an inherent conflict of interest, the Court's review indicates that the use of a trust structure with non-reversionary required periodic contributions from American Airlines presents, at most, an attenuated self-interest on the part of American.[16] Moreover, in this case American Airlines deferred to the opinion of an independent authority, WME, consistent with the collective bargaining agreement entered into between the pilots' union and Defendant. That agreement provides that:

> Any disputes arising as to the clinical validity of a claim or as to the continuation of disability defects, once commenced, shall be referred to a mutually agreed-to clinical source, whose findings regarding the nature and extent of the condition shall be final and binding upon the parties.

---

[15]In December 2003, Dr. Bettes noted that "if [Emery] doesn't show progress in treatment" he might need to "make an aggressive continued Disability Eligibility determination." AA1113.

[16]In a case before the Court of Appeals for the Eleventh Circuit, that court found that a similar structure was not evidence of a structural conflict of interest. Townsend v. Delta Family-Care Disability & Survivorship Plan, 295 Fed. Appx. 971 (11th Cir. 2008).

Supplement F to Collective Bargaining Agreement, ¶ 5(h), AA278-80.[17]  Thus, there was an agreement to refer matters to the WME to resolve disputes raised by pilots, like Emery, as to disability benefits.

At least two other judges in this District already have addressed the question of whether this same ERISA Plan is operated by American Airlines under a conflict of interest.  <u>Meadows v. American Airlines</u>, 2011 U.S. Dist. LEXIS 30839 (S.D. Fla. March 24, 2011), *aff'd* 520 Fed. Appx. 787 (11th Cir. 2013); <u>Turner v. American Airlines</u>, 2011 U.S. Dist. LEXIS 43242 (S.D. Fla. April 21, 2011).  In each of those cases, the court concluded that even if a conflict of interest was present, it did not operate in such a manner to disturb the court's determination that the administrator's decision was reasonable.  In other words, those courts found that weighing the factor of a conflict of interest on the part of the Plan Administrator would only slightly favor the employee and was insufficient to demonstrate that the benefits denial was arbitrary and capricious.

> [American Airlines] has taken active steps to reduce any potential bias - i.e., by using a trust funded through non-reversionary payments and requiring the involvement of an independent medical consulting entity when disputes over eligibility arise.  Furthermore, [no evidence was presented] of 'a pattern or practice of unreasonably denying meritorious claims ....'

<u>Meadows</u> (citations omitted).  Having reviewed the evidence presented by Emery as to the question of a conflict of interest, I am in agreement with the observation of my colleague, noted above.  However, for purposes of analysis, I will assume that

---

[17]These pages are found at ECF No. 117-52.

Emery has shown the potential for some structural conflict of interest to have been a factor in the decision.

The Court now proceeds to address the evidence before me in order to determine whether there was a reasonable basis for Defendant's decision, weighing any alleged conflict of interest as, at most, a slight factor in that decision - consistent with the discussion, above.

FACTS

The parties' motions for summary judgment address the essential question before the Court: was the Defendant's denial of Plaintiff's request for benefits arbitrary and capricious?  The parties agree as to the following facts, unless otherwise noted.[18]

<u>Emery's eligibility for, and receipt of, disability benefits in 2003</u>

Emery worked for Defendant starting in September 1992, and it is undisputed that she was eligible to participate in the Plan's benefits.  Answer, ¶ 6. The Plan, which is subject to the provisions of ERISA, provides retirement benefits

---

[18]See, e.g., Joint Stipulation of Facts, ECF No. 115, and joint notice of filing the Plan, ECF No. 108, and joint notice of filing the administrative record, ECF No. 109.  Plaintiff's Statement of Facts is contained within her corrected Motion for Summary Judgment, ECF No. 128-1; additionally, Plaintiff's response to Defendant's stated facts is found at ECF Nos. 134, 156.  Defendant's Statement of Facts is found at ECF No. 120; additionally, Defendant's response to Plaintiff's stated facts is found at ECF No. 150.

to participants and their beneficiaries, including a Disability Retirement Benefit, available to those who meet the terms of the Plan.

The Plan defines a "Disability" as "an illness or injury, verified through qualified medical authority (as provided in Section 5.4) which prevents a Member from continuing to act as an Active Pilot Employee in the Service of the Employer." Plan, § 2.1(af). Section 5.4 of the Plan provides that the existence of a pilot's disability "shall be determined in accordance" with a set of rules, which include the following: "A Member's disability will be considered to cease to exist if (I) his health is restored so as not to prevent him from acting as an Active Pilot Employee in the service of the Company, (ii) verification of such disability can no longer be established or (iii) appropriate medical care is wantonly disregarded by such Member." Plan, § 5.4(c).

In order to be qualified to serve as a Pilot for Defendant, an individual must obtain a "Valid First Class Medical Certificate" from the Federal Aviation Administration ("FAA"). The Plan's definition of disability, however, does not equate "disability" with a failure to obtain such a Certificate from the FAA.[19]

---

[19]In Larsen v. Air Tran Airways, Inc., 2009 U.S. Dist. LEXIS 116045 (M.D. Fla. Dec. 14, 2009), a pilot challenged the denial of disability benefits after he failed to obtain his FAA medical certification. The court determined that the pilot had not established that the disability benefits plan at issue had a provision for disability solely due to a "loss of license/fitness for duty alone" and, as such, the pilot was not entitled to benefits. The court quoted the plan administrator's observation that "'[t]he FAA has not refused to reinstate your license because of your medical condition, rather, they are unable to determine if your license should be reinstated because you are refusing to undergo the necessary testing that they require.'" Larsen.

In late 2002, Emery was referred to the medical department of American Airlines after she failed to complete a required training program related to her position as a pilot. Dr. Bettes, the Defendant's Medical Director, directed that Plaintiff be evaluated by Dr. Gary Kay, a clinical neuropsychologist. After evaluating Emery on October 7, 2002, Dr. Kay noted evidence of "specific cognitive deficits" and opined that several of the deficient abilities "are essential mental abilities for aviation performance." AA646-648. Dr. Kay indicated that "[c]omprehensive neuropsychological [testing] may be indicated to confirm deficits in the areas where deficits were found ...." Id.

Dr. Bettes also referred Emery for a "fitness for duty" examination by Dr. Elizabeth Jennison, a board-certified physician. Dr. Jennison reported on October 22, 2002,[20] that she found no "evidence of a medical condition which would limit the ability of [Emery] to perform adequately on her required upgrade training [for her duties as a pilot]." AA637-640.[21]

---

[20]Dr. Jennison examined Emery on October 21, 2002. AA637.

[21]Dr. Jennison recorded Emery's history as follows, noting that at that time Emery had not flown in approximately 11 years:

Ms. Emery joined American Airlines in 1992 as a 727 Flight Engineer. After about a year of service, she was furloughed for about 3 years, then returned to duty as a 727 Flight Engineer. Although she has had several prior opportunities to upgrade to First Officer, she has always chosen to defer this. She would have been able to continue deferring until April 2003, but was forced into upgrade training when the American Airlines 727 fleet was ground in April/May 2002.

AA637.

Emery was then referred to Dr. James Hill, a clinical psychologist and neuropsychologist, for assessment. Dr. Hill evaluated Emery on two dates in December 2002, and found "no evidence" of impaired neuropsychological functioning, but recommended that Emery receive "an adequate course of psychiatric treatment to address her depression and performance anxiety." AA624-38. Dr. Hill reported that Emery stated that the reason for her symptoms was "because of the stress of her current work situation" and that she "experienced anxiety only during training/evaluation settings and not in her day-to-day work." AA635. Dr. Hill noted that in light of the extent of Emery's symptoms at that time, "she not be allowed to fly until these problems have been adequately treated as determined by an independent psychiatric evaluation." AA636.

Based on the evaluations submitted by Dr. Kay and Dr. Hill, Dr. Bettes decided to remove Emery from active pilot duty. Although Dr. Bettes determined that Emery was medically disqualified from flight duty, AA620, she was not yet approved for long-term disability benefits at that time.[22]

On her own initiative Emery began seeing a psychiatrist, Dr. Barry Kaplowitz, in November 2002 for depression and anxiety, and Emery communicated this information to American Airlines.[23] Dr. Kaplowitz's initial evaluation of Emery

---

[22]At some point in early 2003, Emery applied for and received short-term disability benefits, which are not at issue in this action.

[23]For example, see Authorization for Release of Information, dated December 3, 2002. AA1176 (in ECF No. 123-2).

observes that she was "tearful at having to deal with emotional trauma of employment" and was having "PTSD from training program." AA544.  His diagnostic impression was that she had "Adjustment dis. w/depressed mood." Id.[24] He also noted that she had "Lf. Eye strabismus." Id.

On June 19, 2003, Dr. Bettes wrote to Emery that she would need to comply with a directive from the flight office of American Airlines, which required her to initiate and document "an active course of therapy" to address her symptoms of depression and performance anxiety. AA1115, found at ECF No. 123-1.  Dr. Bettes requested that Emery direct Dr. Kaplowitz to submit records detailing the current course of treatment, and Dr. Bettes noted that it was anticipated that "after an appropriate and time-limited course of treatment you may be cleared by [American Airlines] Medical to resume training as determined appropriate by the Flight Office." Id.  Emery sent a letter to Dr. Bettes on June 23, 2003, stating that she had not received a "treatment plan" from American Airlines and asking whether it was mandatory that she be treated by a psychologist (Dr. Rick Suarez) whom had been referred to her by Dr. Bettes' staff. AA1000-01, found at ECF No. 122-3.  Dr. Bettes responded by directing Emery to contact Dr. Suarez "to initiate and begin treatments for your symptoms of depression and performance anxiety" and noted that "[i]n addition, you will need to have your Psychiatrist, Dr. Barry Kaplowitz

---

[24]In a letter sent to American Airlines in April 2006 on Emery's behalf, Dr. Kaplowitz indicated that he had been seeing Emery as a patient since November 2002, at which time "she was dealing with stress issues which over time worsened to Major Depression and Generalize[d] Anxiety." AA582.

forward to me for review complete records detailing your recent treatments with him." AA986, found at ECF No. 122-2. Dr. Kaplowitz wrote a letter dated June 30, 2003, which includes the following statement:

> At this time Ms. Emery has developed a depressed mood from the prolonged stressful deliberations and testing [by the pilots' union and American Airlines]. During this time it was clear that she has had a visual Strabismus, which might have caused her to be somewhat slower on computer testing. But otherwise she is not in need of medications for this depressed/anxious mood only supportive guidance as to why she was capable of flying previously but not now. If her coordination of hand, eye speeds are no longer at the level that is necessary for the airline industry, I believe Ms. Emery can accept that disability. But it needs clarification and not threats ....

AA602.

Emery began seeing Dr. Suarez in July 2003. In a Psychological Treatment Summary dated Oct. 21, 2003, AA520-21, Dr. Suarez reports that Emery was "temporarily totally disabled to perform her job as a pilot." He notes that her observed condition, after nine two-hour sessions every other week, was consistent with a diagnosis of "Mood Disorder, Not Otherwise Specified, with Anxiety Features," and "Personality Disorder, Provisional." Id. Dr. Suarez noted that he contacted Dr. Kaplowitz and suggested that Emery might be "an appropriate candidate for psychotropic medication to help elevate her mood, reduce her anxiety and help her sleep pattern." AA521.

In a letter dated October 17, 2003, Emery was advised by American Airlines that she had been approved for long term disability benefits because of her "medical inability to act as a Pilot," and that such benefits were retroactive to October 9,

2003. AA765.  Defendant sent a similar letter to Emery on January 7, 2004,

indicating that the benefits period had been modified to be retroactive to March 18,

2003. AA756.

Dr. Suarez provided another Treatment Summary, dated Jan. 22, 2004,

which noted that Emery had begun taking Zoloft in mid-January 2004[25] and that

Emery "has continued to show improvement and stability of mood." AA523-24.  He

revised her diagnosis to "Mood Disorder ..., In Partial Remission."   Five months

later, his Treatment Summary notes that her diagnosis is "Mood Disorder ..., with

Anxiety Features, In Medical Remission." AA525-26.  A similar report, dated Nov.

1, 2004, AA527-28, makes the same finding as to diagnosis, and observes that "it is

not known to what degree, if any, her opthamological condition [a tentative

diagnosis of vitriol retinal traction] may impact on [the plan for her to return to

flight training]." AA528.

At a treatment session with Dr. Kaplowitz in early 2003, Dr. Kaplowitz noted

that Emery was "seeking advice about Strabismus." AA546.  He mentions

strabismus again in the note from a session in late 2004: "Patient will forward

---

[25]At the time, Zoloft (a trade name for the generic medication Sertraline) was
considered to be a drug which disqualified a pilot from obtaining her necessary
license from the Federal Aviation Administration. See, e.g., Hannagan v. Piedmont
Airlines, Inc., 2010 U.S. Dist. LEXIS 31472 (N.D.N.Y. 2010).  In Hannagan, the
court reversed the denial of benefits, finding that the record revealed an underlying
health-related disability; the court observed that the pilot had "functional
limitations before taking [Zoloft]" and also had another medical condition.  The
facts in Hannagan are distinguishable from the facts before me at present and, as
noted at oral argument, the FAA policy changed in April 2010, such that Zoloft is no
longer an automatically-disqualifying medication.

optical test result from Dr. Weiss on Strabismus." AA549. At a subsequent session in 2004, he noted that Emery "had a scare over possible vision loss when she had a vitrous leak in eye; will recommend that she take a permanent disability from airline." AA550. At a session in 2005, Dr. Kaplowitz notes that Emery had started eye exercises she found on the internet, AA550, and at the following session - on April 13, 2005, Dr. Kaplowitz notes "Binocular instability - Dr. in Ft. Lauderdale" without further comment. AA551.

In a report dated April 8, 2005, Dr. Suarez observed that Emery "will maintain her therapeutic gains and functional abilities without medication" and that she should be able to return to training the following month. AA529-30. Dr. Suarez's report dated Nov. 27, 2005, observes that Emery continued to attend therapy with Dr. Suarez while being weaned off Zoloft by Dr. Kaplowitz. AA531-32. Dr. Suarez anticipated that Emery would be able to return to flight training "once her medication is discontinued." AA532. In other words, Dr. Suarez appears to tie Emery's inability to return to flight training to the fact of her continued use of Zoloft.

On Oct. 7, 2005, Dr. Kaplowitz reported that Emery had "become very upset at receiving news of disturbance of vision from Dr. Chao." AA552. The record indicates that Emery saw Dr. Chao, an optometrist/acupuncturist, on March 31, 2005. In a report dated Sept. 13, 2005, Dr. Chao noted that his examination of Emery in March 2005 revealed that "Emery's eyes are healthy ... [but that she] shows extremely fragile and unstable binocular vision [from what appears to be] a

18

long-standing condition." Dr. Chao noted that Emery had "marked binocular problems" and that such problems "are significant to her career as a pilot." AA510-12. He also reported that Emery was being treated by Dr. Thomas Weiss, for "posterior vitreous detachment" with symptoms which had started in approximately July 2004. AA510.[26] No record was provided from a Dr. Thomas Weiss. A single record, a prescription form, was provided from Dr. Herbert Weiss and it appears to be dated in early 2003; the form includes a barely legible diagnosis - which apparently reads "Alternating Esophoria." AA513 (see AA569, in which Dr.. Kaplowitz refers to the diagnosis).

On March 21, 2006, Dr. Kaplowitz treated Emery and remarked that she was continuing to "deal with lack of ability to fly [due] to sight [and medicine] management" but that he was not able to reduce her dose of Zoloft at that time. AA552 (emphasis added).

On April 4, 2006, American Airlines requested that Emery instruct Dr. Suarez and Dr. Kaplowitz to submit progress reports with diagnosis and treatment, noting that "[t]he medical documentation is required to substantiate continued medical disability benefits." AA584. On April 21, 2006, Dr. Kaplowitz reported to American Airlines that Emery "continues to be seen on a regular basis and

---

[26]Dr. Chao reports that Emery had a prior episode of "large highly mobile floaters and flashes in the right eye, with onset about eight months previously, diagnosed as secondary to posterior vitreous detachment" and that "[t]his condition was being followed and treated by Thomas Weiss, MD, with consultation at the Bascom-Palmer Eye Institute." AA510. Emery provided no evidence that she was treated by Dr. Thomas Weiss.

medications will be considered to be lowered at our next visit in June. She was last seen on [April 19, 2006]." AA582. Dr. Kaplowitz opined that Emery's diagnosis at that time was "Major Depression, Generalized anxiety disorder," and reported that Emery was taking 75 mg daily of Zoloft. Id. He also noted that Emery was diagnosed with "Optical Strabismus" but does not indicate any treatment being provided for that condition. Id.

Dr. Suarez provided his records which demonstrated that Emery was treated by Dr. Suarez on three occasions between November 2005 and May 2006. Dr. Suarez reports in a Treatment Summary dated May 28, 2006, that he will follow Emery on a "supportive and/or as needed basis until such time as she is medication free." AA534. Significantly, he noted that he had seen Emery in January and April 2006, and Emery had "maintained her therapeutic gains and has not manifested any reoccurrence of her clinical depression." AA533. Emery was treated by Dr. Suarez on only one other occasion in 2006: at an appointment on September 20, 2006, Dr. Suarez observed that Emery appeared to be maintaining her "therapeutic gains" and had a "stable mood and affect." AA515. Progress notes from Dr. Suarez's treatment of Emery during sessions in 2005-2006 do not mention her vision. Emery apparently only discussed her vision with Dr. Kaplowitz.

At treatment sessions in late 2006 and early 2007, Dr. Kaplowitz indicated that Emery was "unable to stay focused, easily distracted" (Nov. 27, 2006), was "unable to stop cycle of apathy in life very unmotivated" (Jan. 31, 2007), and continued to need Zoloft "for a labile mood" (March 16, 2007). AA555. At a session

in mid-2007, he observed that Emery was "in process of getting help from legal/psychological/financial advisement [sic] in order to rectify all social/business matters that ail her," and that he would continue to provide medication and supportive therapy. AA556. Dr. Kaplowitz makes no observations about Emery's vision in his Progress Notes related to visits after March 21, 2006.

Dr. Suarez treated Emery on January 18, 2007, noting that "overall she appears stable." AA516.[27]  None of Dr. Suarez's notes from January 2006 to January 2007 include a reference to Emery's vision.

### Decision to discontinue Emery's benefits in 2007

On January 25, 2007, Dr. Bettes sent a letter to Emery notifying her that "verification of your continued disability and necessity of continued medical treatment cannot be established." AA541-42. The letter informs Emery that her disability benefits "are being terminated because it can not be established that you continue to remain disabled and unable to pursue obtaining your FAA medical certificate with the goal of returning to your job as a pilot for American Airlines." Id. Dr. Bettes explained that the Plan provides that a pilot's disability "will be considered to continue to exist only if the Pilot Employee ..... [sic] continues to receive qualified medical care consistent with the nature of the illness or injury that

---

[27]Dr. Suarez treated Emery on four other occasions in 2007, and provided a report to Defendant on August 29, 2007, with the progress notes for those treatment sessions. AA514-19. See discussion, below.

gives rise" to the disability.[28]

Specifically, Dr. Bettes noted that Emery was advised in June 2003 that she would be required to initiate a course of therapeutic counseling to address her symptoms related to "depression and performance anxiety" and that there was no documented objective evidence that Emery continued "to have a mental impairment that requires prolonged treatment." Id. Dr. Bettes referenced the records from Dr. Suarez and Dr. Kaplowitz, noting that Emery's "counselor" had previously estimated that the onset of Emery's symptoms began at some time "'between October and December of 2002."[29] Dr. Bettes observed, however, that Emery had been examined in December 2002 by Dr. James Hill, in a "Fitness-for-Duty evaluation," and that those records revealed "'no evidence of impaired functioning on any of the tests of neuropsychological functioning.'" Id.[30] Dr. Bettes noted that

---

[28]Section 5.4 of the Plan provides that the existence of a pilot's disability "shall be determined in accordance" with a set of rules, which include the following: "A Member's disability will be considered to cease to exist if (I) his health is restored so as not to prevent him from acting as an Active Pilot Employee in the service of the Company, (ii) verification of such disability can no longer be established or (iii) appropriate medical care is wantonly disregarded by such Member." Plan, § 5.4© (emphasis added). This section was amended by the Second Amendment to the Plan, solely to capitalize the "d" in disability.

[29]This reference is to a letter dated November 10, 2003, from Dr. Suarez to the pilots' union: "Based on my discussions with Ms. Emery and a review of prior medical and psychological documentation, I would estimate the onset of her present condition to have occurred sometime between October and December of 2002. AA1110.

[30]Dr. Bettes remarked that Dr. Hill did recommend that Emery "receive 'an adequate course of psychiatric treatment to address ... depression and performance anxiety.'" AA541.

evidence-based treatment guidelines suggested that a "reappraisal of treatment" occur if there is no moderate improvement of symptoms and that a "thorough review and reappraisal of the diagnosis, complicating conditions and issues, and treatment plan should be conducted." Id.

Dr. Bettes advised Emery of her right to appeal the decision to the PBAC for review, and provided instructions on how to submit her appeal. Id.

### Emery's appeal to the PBAC and her requests for documents

After Emery's benefits were terminated she received an email from a union representative providing instructions for submitting an appeal. AA503 (email dated Feb. 16, 2007). In a letter dated March 3, 2007, addressed to "American Airlines, Inc., Employee Services" Emery requested copies of "all documents, records, and other information relevant to the termination of my disability benefits." AA502. Defendant asserts that the letter was not received by the PBAC prior to the filing of Emery's appeal,[31] and Plaintiff has offered no evidence, i.e., no return receipt or other acknowledgment, that the letter was received.

On June 29, 2007, Dr. Kaplowitz sent a letter to the PBAC on Emery's behalf. AA569. In that letter Dr. Kaplowitz reports that Emery has been under his psychiatric care since November 2002, and that his "initial treatment consisted of solely psychotherapy for anxiety/depression caused by her performance related

---

[31]The letter bears a stamp "RECEIVED Aug 17 2007." AA502.

stress" due to the rules disallowing a pilot's reliance on a psychotropic medication. According to Dr. Kaplowitz, during this treatment period, i.e., November 2002 through June 2007, "it became apparent" that Emery had a "visual strabismus" and, after referral to eye specialists (Dr. Thomas Weiss, ophthalmologist, and Dr. Herbert Weiss, optometrist), Emery was diagnosed with "Vitreous floaters/Alternating Esophoria" and was prescribed eye exercises and rest. Id.[32]

Dr. Kaplowitz notes that Emery was referred by American Airlines to Dr. Suarez, "who is now currently seeing her." According to Dr. Kaplowitz, he had proscribed Zoloft 25 mg/day, increased to 100 mg/day, to Emery, and then in February 2005 Dr. Suarez requested that Emery be weaned off the medication - as he believed that her anxiety/depression were resolved. Dr. Kaplowitz reports that he so ordered, but that Emery suffered "side effects from this weaning, a relapse of anxiety/depression." Dr. Kaplowitz notes that Emery's anxiety was exacerbated by the costs of repairing storm damage to her home in 2005 and taking flight simulator training (at a cost of $500-$1,000/hour). According to Dr. Kaplowitz's letter dated June 29, 2007, "[p]resently, it is impossible to stabilize Ms. Emery without the daily intake of psychotropic medications; this clinical dilemma renders Ms. Emery a disabled pilot." AA570.[33]

---

[32]As noted, above, no record was provided from a Dr. Thomas Weiss, and the only record provided from Dr. Herbert Weiss was a brief prescription with a barely legible diagnosis.

[33]From this report in June 2007, it appears that Dr. Kaplowitz's opinion was that Emery was disabled *as a result of* taking a psychotropic medication, i.e., that

On July 17, 2007, American Airlines, through Deborah Jameson on behalf of the PBAC, acknowledged receipt of Dr. Kaplowitz's letter and that it appeared to be Emery's initial effort to file an appeal.  Defendant's letter noted that it was granting Emery an additional 30 days (which apparently had not been requested by Emery) in which to submit an appeal with supporting documentation.  AA566-67.

On August 13, 2007, Emery sent an email to a representative at the union, with a copy to Dr. Bettes, which included a document titled "AA disability appeal." AA87-92 as found in ECF No. 117.  Emery describes her illness as "Generalized Anxiety Disorder and Major Depression," and notes that she is taking Zoloft and receiving "medical treatment consistent with the nature of the illness."  AA89 in ECF No. 117.  Emery makes no mention of her eyesight, nor any vision problems, nor does she reference any treatment being provided by a vision-related medical professional.  In a letter dated August 16, 2007, American Airlines, through the office of the PBAC's Appeal Coordinator, advised Emery that they had received her appeal.  AA476.

Emery also submitted an appeal on the Defendant's appeal form, which was received by the PBAC on August 17, 2007.  AA490.  With that appeal, Emery included an "Amended Supplement to Disability Appeal," AA492-495, and a copy of the letter from Emery to Defendant dated March 3, 2007, requesting "documents, records, and other information" relevant to the termination of her disability

---

was the "clinical dilemma" presented.

25

benefits. AA502. The PBAC also received thirteen pages of notes from her

treatment by Dr. Kaplowitz. AA544-556. The handwritten "Progress Notes"

include brief statements[34] as to treatment rendered on each of several occasions

beginning on November 18, 2002 and continuing through early 2007.[35]

    The record reflects that Emery spoke by telephone with Jameson, of the

PBAC, on August 22, 2007. Jameson's notes of that conversation are as follows:

> I then asked [Emery] if she would be sending any other clinical records from
> any other doctors that she feels would support her appeal for continuing
> disability, and told her in specifics, the records from her eye specialists
> (opthalmologist [sic] [and] optometrist she was seeing). She said that she
> was concerned that those [records] might get back to the Company [and]
> might disqualify her from returning to work (note, that in our prior
> conversation on 8-15-2007, I explained to her that appeal documents were
> applicable to her benefit appeal only [and] were not provided to her chief
> pilot, superiors, or managers of her job). I specifically asked her if I
> understood her to say that she won't be sending me any more records in
> support of her appeal (other than those that are coming from Suarez) and she
> confirmed that she would not be submitting any other records in support of
> her appeal ....

AA.487-88. Despite Emery's comments to Ms. Jameson, it appears that Emery did,

in fact, submit further medical records in support of her appeal.

    On August 23, 2007, Emery faxed to the PBAC a copy of the report by Dr.

--------

[34]For example, the entire entry for treatment rendered on a date in early
2006 is: "Patient less tearful trying to busy herself with community activities also
trying to help pay for roof repairs." AA553.

[35]Emery was seen by Dr. Kaplowitz for a total of eight treatment sessions in
2003: Jan. 6, 11, 20, 27, July 18, Aug. 22, Sept. 24, and Oct. 27, 2003; for a total of
six treatment sessions in 2004: Feb. 20, April 23, July 2, and two other dates in
2004; six sessions in 2005; and eight sessions in 2006. AA544-556.

Chao (optometrist/acupuncturist), dated Sept. 13, 2005,[36] which states that "Emery's eyes are healthy ... [but that she] shows extremely fragile and unstable binocular vision [from what appears to be] a long-standing condition." As noted above, Dr. Chao noted that Emery had "marked binocular problems" and that such problems "are significant to her career as a pilot." AA510-12. Dr. Chao's report makes no mention of recommended treatment, but indicates that "[recent work-related stress is one likely precipitating factor" to Emery's vision problems. AA512.[37]

On August 29, 2007, Dr. Suarez provided the PBAC with his treatment summaries and his progress notes as to Emery. AA514-17. Dr. Suarez opined in a report dated August 8, 2007, that in her current condition, Emery was "disabled from functioning in her job as a pilot or returning to training" but that it was "quite possible that with continued treatment, which includes the discontinuation of her current medications" she might be restored to functionality as to her employment and training. AA518-19 (emphasis added).

Jameson, on behalf of the PBAC, collected the relevant medical submissions from Emery and her treating physicians, as well as the information from her claim file, and delivered the compiled information to WME, which - as noted above - had

---

[36]The report by Dr. Chao refers to a single examination of Emery on March 31, 2005, i.e., more than two years prior to the time Emery submitted her appeal of Defendant's discontinuation of Emery's disability benefits.

[37]Emery had reported to Dr. Chao that Emery had "extreme job-related stress." AA510.

been jointly selected by the pilots' union and American Airlines.[38]  By letter dated

Sept. 17, 2007, Defendant requested that WME perform an "evidence-based,

forensic medical review/evaluation ('peer review')" of Emery's claim.  AA651.  The

noted conditions claimed are "Depression and Performance Anxiety; Mood Disorder,

NOS, with Anxiety Features (question of Personality Disorder as a secondary

diagnosis)."  Id.  American Airlines posed five questions for WME to address:

> 1.  Does the evidence reflect continuing presence of her psychiatric diagnoses on or beyond January 31, 2007?  If so, specify which diagnoses are present, and indicate whether or not they continue to exist at a level of severity requiring medical treatment.
>
> 2.  Does the evidence reflect objective findings of these aforementioned psychiatric diagnoses, or other psychiatric diagnoses?  Please explain.
>
> 3.  Does the evidence reflect continuation of disability, arising from her psychiatric diagnoses, beyond January 31, 2007?  Why or why not?
>
> 4.  Does the evidence reflect the continuation of ongoing regular medically-appropriate treatment recommended/administered for these diagnoses? Please explain.
>
> 5.  Does the evidence reflect that the pilot has sought and received medically appropriate treatment recommended/administered for these diagnoses? What type, frequency, and duration of treatment is medically appropriate in this case?  Does she require continuation of treatment beyond January 31, 2007?  Please explain.

AA652.  The letter identifies Jameson as the point of contact for American Airlines.

------

[38]The parties stipulate that American Airlines engaged WME to provide medical consulting services in numerous specialties of medicine, including ophthalmology, psychiatry, and psychology, and was responsible for compensating WME for such services.  ECF No. 115.

PBAC decision and Emery's renewed request for documents

As noted above, WME was asked to perform a "peer review" of the medical file and provide a written report and recommendations as to whether Emery was disabled.  Two medical professionals from WME, Dr. Jack Greener (a board certified psychiatrist) and Dr. Karen Grant (a Senior Aviation Medical Examiner), performed the peer review, and submitted a written report.

The initial WME report, ten pages in length, noted that Dr. Kaplowitz's psychiatric conclusions (that Emery needed to take Zoloft) were probably unreliable and biased because he had a sympathetic relationship with Emery and had become her "advocate." AA663.  The WME reviewers observed that Dr. Kaplowitz's notes from January 2007 forward "do not provide any diagnoses." AA662.  Also, they noted that Dr. Suarez's notes from February 2007 forward did not provide significant objective findings "in the very few occasions on which he has seen the subject in 2007." AA663.[39]  The WME doctors noted that there is evidence that Emery "is depressed and anxious but the symptoms now appear to be due to the fact that her disability payments have been discontinued." AA663.  "Thus, no objective evidence has been provided since 01/2007 of a condition of such severity that it would render the subject unable to perform her job." AA663.

According to Dr. Greener and Dr. Grant, "[Emery] has sought and received treatment, but if return to work was part of the [treatment] plan, treatment was not

---

[39]At the time of WME's review of the record in September 2007, Dr. Suarez had treated Emery a total of five times in 2007.

appropriate." AA664.

> [Treatment] should have consisted of much more in depth psychotherapy, behavior modification and the use of medications to attempt to alleviate all symptoms of depression and anxiety without regard to whether or not she would be allowed in the cockpit while taking these medications. Once she had been stabilized, then discontinuation or change of medications to ones that are felt to be appropriate could have occurred. However, this did not take place and <u>it appears evident that the basis for continuing treatment was to provide sufficient documentation for continued disability</u>.

AA664 (emphasis added). The WME doctors noted that the mental status evaluations conducted by Drs. Kaplowitz and Suarez were very limited in their description and did not demonstrate that Emery was unable to perform activities of daily living nor had her treating physicians documented that she was having "thought disorder [and Emery's treating physicians' evaluations of Emery] did not demonstrate severe affective disorder, did not demonstrate postraumatic stress disorder, did not demonstrate possible harm to self or others, cognitive disorganization or dysfunction or substance abuse." AA664.

After addressing the evidence presented to them, Dr. Greener and Dr. Grant concluded:

> Therefore having reviewed the pilot's job description and the [Plan] ... the only reason at this time and from January 31, 2007 forward for this pilot to be considered *disabled*, is the fact that she is taking [Zoloft], even though over the years of treatment this medication does not appear to have been of significant [sic].

AA664 (italics added).   Finally, they opined that:

> In summary therefore, *if the administration of [Zoloft] prevents the pilot from performing her duties [then] she is considered disabled from January 31, 2007 forward.* However there is no clinical evidence that [Zoloft] has been of benefit in her treatment or is medically necessary for the treatment of her

30

condition at this time.

AA665 (italics added).

After receiving a copy of the WME report by facsimile on Sept. 28, 2007,

Jameson phoned WME two weeks later to discuss the report.  According to

Jameson's notes of the conversation, she advised WME as follows:

> there's a distinction between being 'not fit for duty' (because of taking an
> FAA-disqualifying mediation) [and] being disabled.  Please explain to the
> specialist - we're not asking him to opine on fitness for duty - only on the
> disability issue - the Pilot's taking this medication doesn't necessarily mean
> she meets the [definition] of disability in the plan.  Please have dr call if he
> has questions.

AA655 (handwritten notes dated Oct. 11, 2007).

On October 17, 2007, WME provided a revised copy of its report to Jameson -

the sole revision was as to the concluding paragraph:

> In summary therefore, *from all the information available there is no evidence
> that the pilot is disabled from performing her job duties from January 31,
> 2007 forward.*  However there is no clinical evidence that [Zoloft] has been of
> benefit in her treatment or is medically necessary for the treatment of her
> condition at this time."

AA677 (italics added).  The following day, Jameson called to ask "Dr. Greener to

clarify [whether a particular statement in the report was as to] a fitness for duty

issue or a disability issue." AA666.  Dr. Greener revised the report, finally, to state:

> Therefore having reviewed the pilot's job description and the [Plan] ... the
> only reason at this time and from January 31, 2007 forward for this pilot to
> be considered *unfit for duty*, is the fact that she is taking [Zoloft], even
> though over the years of treatment this medication does not appear to have
> been of significant [sic].

AA687 (italics added).  Notably, each version of the WME report includes the

31

observation that there "is no other documentation in the specialty of psychiatry which demonstrates that this pilot is disabled with regards to the [Plan]." AA664.[40]

Defendant, through the PBAC, notified Emery on October 22, 2007, that her appeal had been denied and that the discontinuance of her long term disability benefits was "proper and in accordance with the provisions of the Plan." AA467-74. Defendant stated that the reason for the decision was the "inability to verify the continuance of [Emery's] disability (resulting from your psychiatric disorders) and inability to verify your continuance of and compliance with qualified appropriate medical care for your psychiatric disorders." AA469.

In a letter dated Jan. 16, 2008, Emery requested a copy of "all documents and other information relevant to my disability claim and the termination of my disability benefits." AA689-90. American Airlines responded by letter dated January 22, 2008, from the PBAC, providing copies of the requested documents relating to Emery's appeal, AA698, and by letter dated January 28, 2008, from the office of Human Resources, by providing a copy of the Plan. AA694. Neither letter addresses the concern raised by Emery in her letter of January 16: that she had made an initial request for information on March 3, 2007. AA690.[41]

---

[40]This statement is unchanged throughout the three versions of the WME report discussed above. AA664, AA676, AA687.

[41]In her January 2008 letter Emery also claims to have made a written request for information on November 8, 2007, AA690, but Emery has not produced evidence of any such request.

ANALYSIS

It is undisputed that the Plan vests the PBAC with discretion to review and decide appeals from the denial of benefits.[42] In light of that discretion, the Court must uphold the Plan's determination unless it is found to be "arbitrary and capricious." Ward v. Ret. Bd. of Bert Bell/Pete Rozelle NFL Player Ret. Plan, 643 F. 3d 1331 (11th Cir. 2011). As long as there was a reasonable basis for the PBAC's decision, i.e., the decision to deny benefits was supported by at least some reliable evidence, this Court must uphold the decision, even if Emery's position also was reasonable. The Plan need only demonstrate that it relied on substantial evidence for its decision; substantial evidence has been described in other contexts as "more than a scintilla, but less than a preponderance." Bloodsworth v. Heckler, 703 F.2d 1233. 1239 (11th Cir. 1983). See, also, Pierce v. Underwood, 487 U.S. 552 (1988) (citations omitted) ("That phrase [, "substantial evidence"], does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

Even if this Court finds that a conflict of interest existed, Emery still must demonstrate that the decision to deny her benefits claim was arbitrary and capricious. Simply stated, after weighing all of the evidence, I must determine

---

[42]As noted above, the Plan grants to the Administrator, American Airlines, the "authority to control the operation and administration of the Plan, except to the extent such responsibility and authority has specifically been assigned" to the PBAC. Plan, § 11.1 (Sixth Amendment). The Plan also grants to the PBAC the power to decide questions as to eligibility for benefits. Plan, § 11.3(c)(iii) (Fifth Amendment).

whether the PBAC had reasonable grounds to support its decision to discontinue Emery's benefits, and I must uphold the PBAC's decision if there is substantial evidence to support that decision, i.e., if there was a reasonable basis for the decision to deny disability benefits to Emery, even if there is some evidence supporting a contrary result.

### Medical evidence before the PBAC prior to its decision to deny benefits

The Court has reviewed the medical evidence contained in the Administrative Record - all of which, of course, was available to Defendant for review when making its determination as to Emery's appeal.  The Court has identified some of that evidence specifically, above, and the evidence is summarized, below.

From late 2002 through 2007, Emery received periodic psychiatric treatment from her personal psychiatrist, Dr. Kaplowitz, and from early 2003 through 2007, Emery was treated by a psychologist recommended by American Airlines, Dr. Suarez.  At Dr. Suarez's suggestion, Dr. Kaplowitz prescribed the anti-depressant drug Zoloft as an aid in Emery's recovery; it appears that the approach was to stabilize her condition, at which point she could discontinue taking the drug and then return to active pilot duty.

Emery began taking Zoloft in January 2004 and continued taking it for at least the next three years.  Dr. Kaplowitz reported that he attempted to wean Emery off Zoloft or reduce her dosage, but was not successful, as Emery reported

that her depression and anxiety worsened at those times.  He noted that her symptoms were exacerbated by deaths in the family, property damage from Hurricane Katrina, and her fear that she would not be able to return to flying.[43]

Dr. Kaplowitz summarized his course of treatment of Emery and opined that, in his opinion, she was disabled; specifically, he noted that Emery was not yet ready to discontinue Zoloft, especially considering that her depression and anxiety symptoms seemed to be getting worse.  Dr. Suarez also submitted medical reports which included a summary of his opinion on Emery's condition.

Both of Emery's treating doctors' evaluations can be understood as suggesting that Emery's disabling condition was the fact of her taking Zoloft, i.e., that she was disabled because of the medication she was taking.  In other words, they appear to have conflated the question of whether she would be eligible for a pilot's license with the question of whether she was disabled and unable to return to work.[44]  The critical question, however, was not whether Emery was taking Zoloft (which at the time undeniably rendered her unfit for duty, as she would not be able to obtain a required FAA license), but whether it was necessary for her to take

---

[43]Dr. Kaplowitz noted in October 2005 that he had increased Plaintiff's medication "at least for 2 month[s] when reevaluation will be done."  AA552.  To the extent a "reevaluation" was done, the documentation thereof is limited.  AA552-56.  For example, one entry simply states: "Patient seen with increased anxiety of how to cope with finances and Hurricane damages."  AA553 (dated April 19, 2006).

[44]In light of the FAA's change in its policy in early 2010 regarding licensure of pilots taking Zoloft, the Court notes that a disability claim based solely on having a prescription for Zoloft would likely fail after 2010.

Zoloft, i.e., was the Zoloft medically necessary to treat "an illness or injury verified through a qualified medical authority that prevents a pilot from continuing to work as a pilot for the Company."[45]

### The decision to deny benefits was not the result of an abuse of discretion

The WME doctors reviewed several items before delivering their report: Emery's appeal letter, the medical reports from Dr. Kaplowitz and Dr. Suarez, the report from Dr. Chao, the prescription from Dr. Weiss, the terms and conditions of the Plan, correspondence in the claims file, and the reports of Dr. Kay, Dr. Jennison and Dr. Hill.  AA656-61.  WME ultimately determined that the record did not support a finding that Emery had an underlying condition for which Zoloft was medically necessary and that Emery had not established that she was disabled according to the Plan.  The PBAC accepted the conclusion of the WME, and denied Emery's appeal.

Emery argues that the decision to deny her administrative appeal was arbitrary and capricious because the PBAC, in reaching its decisions, relied at least in part upon statements and/or conclusions that Dr. Bettes had expressed in his original decision to discontinue Emery's benefits in January 2007.  According to Emery, Dr. Bettes's conclusions were false and not reliable because when he

---

[45]Perhaps Emery herself mistakenly believed that simply having a prescription for Zoloft was sufficient to prove that she suffered from a disability, or suffered from an "illness or injury" according to the Plan.

formulated his decision, he had not reviewed the most recent updates from Dr. Suarez and Dr. Kaplowitz about Emery's medical condition.  Defendant argues that, even if Dr. Bettes had behaved improperly in reaching his decision - a point which Defendant strongly contests - such factor is not relevant, as the only relevant decision is the appellate decision when examing an ERISA-governed dispute.

To file an ERISA action a plaintiff must first exhaust her administrative remedies, which includes the filing of any relevant administrative appeal.  In this case, the PBAC, through its reliance on a peer review conducted by WME, made a determination on appeal as to whether Emery was "disabled" based on the evidence in the administrative record.  Emery, of course, bore the burden of producing evidence to support her claim for long term disability benefits.  Upon reviewing the evidence presented, the PBAC was free to accept or reject Dr. Bettes's decision in January 2007 to deny benefits.[46]  WME's experts, Dr. Greener and Dr. Grant, reviewed the medical evidence and reached their own conclusion that Emery was not disabled.   The PBAC then, consistent with the agreement of the pilots' union and American Airlines, relied on the WME report in rendering its decision.

Plaintiff urges this Court to find that the decision was arbitrary and capricious because it failed to account for her treating physician's opinions that she

--------

[46]Indeed, the questions posed to the WME included a request that WME determine whether Emery was disabled not only as of the date of the denial, but also at any point beyond January 31, 2007, i.e., a time period after Dr. Bettes had reached his conclusion that benefits should be denied - which is evidence of the freedom with which the WME could render its decision.

was disabled. The record of their diagnosis and treatment of Emery, however, was underwhelming as to its comprehensiveness or effectiveness. The WME doctors addressed the treating physician's reports, and made specific criticisms of the conclusions therein, and Plaintiff has failed to establish that the WME doctors' opinions were unreliable.[47]

Defendant was free to deny disability benefits in the face of conflicting medical opinions, as long as it had reasonable grounds to do so. A determination to discontinue benefits would be reasonable if it was based on the fact that although Zoloft undeniably rendered a pilot unfit for duty at that time, that condition was not the same as a being disabled under the Plan as a result of an "illness or injury." In light of this record, the Court does not find that the Defendant abused its discretion.

Emery also argues that the Defendant's decision was arbitrary and capricious because Defendant failed to address Emery's vision problems, which she claims could have been a disability that would have prevented Emery from resuming her job as a pilot. While it is true that Defendant's October 2007 letter denying her claim does not explicitly identify and reject a claim for disability based on a vision problem, the WME letter references a review of Dr. Kaplowitz's report that Emery

_____

[47]Plaintiff has not established that the Defendant relied only on "snippets" of records taken out of context. Helms v. Gen. Dynamics Corp., 222 Fed. Appx. 821, 833 (11th Cir. 2007) (it was unreasonable for an ERISA plan administrator to rely on a "scintilla of evidence pulled out of context" in the face of extensive documentation supporting a claim for short-term disability benefits). Instead, Defendant, through the agreed-upon reliance on WME, evaluated all of the evidence and found that Emery's treating physicians had not substantiated a claim for disability.

had been referred to eye specialists and that the treatment recommendation was "eye exercises and rest." Moreover, the record before the WME was devoid of evidence that Emery's vision had been evaluated or treated at any time after March 2005.[48]

Notably, Emery's prepared appeal did not focus on her vision, and Emery told Jameson by telephone that Emery's disability claim was only related to her psychiatric problems, not her vision. Emery later supplemented her appeal with a letter from Dr. Chao concerning her potential vision issue, which was reviewed by WME. Emery advised Jameson that Emery had "recently received this report" from the pilots' union, and it "was not considered a factor in American Airlines's initial decision to medically disqualify me." She added that since Dr. Kaplowitz "mentions it in his report, I decided to submit it."[49] Such statements by Emery do not reveal that she was seeking disability as the result of a vision-related "illness or injury." And, even if Emery was attempting at that time to claim disability related to a vision defect, there was no evidence that she had sought or received any treatment of the issue for more than two years, nor had her treating psychiatrist even

---

[48]The single record from Dr. Chao was from an appointment date in March 2005, and the only record provided from Dr. Herbert Weiss was a brief prescription (with a barely legible diagnosis) which appeared to be from 2003.

[49]In fact, Dr. Kaplowitz had mentioned in October 2005 - many months after Emery saw Dr. Chao - that Emery was upset about the news of her vision instability from Dr. Chao. AA552. Notably, Dr. Kaplowitz makes no mention of Emery being concerned about her vision during two appointments (May 2005 and July 2005) which were after Emery's visit to Dr. Chao in March 2005.

mentioned the issue in the past year.  In March 2006, Dr. Kaplowitz remarked that

Emery was continuing to "deal with lack of ability to fly [due] to sight [and

medicine] management" but that he was not able to reduce her dose of Zoloft at that

time.  AA552.  In other words, he attributed her disabling condition to her vision

problems and her taking Zoloft.  No further comments about Emery's vision are

found in Dr. Kaplowitz's Progress Notes after March 2006.

Emery bears the burden of producing evidence that she is disabled according

to the terms of the Plan.  The Plan does not require the Administrator to take

affirmative steps to contact Emery's medical professionals in order to obtain

additional information on her behalf.  While an ERISA administrator is not to

arbitrarily refuse to credit a treating physician's opinions, it also need not grant

greater weight to them.  The record reveals that there simply was little or no

evidence that Emery had recently been diagnosed with a vision defect and there

was no evidence that Emery was receiving treatment for a vision defect.

As another argument in support of her claim that the Defendant's decision

was arbitrary and capricious, Plaintiff alleges that the relationship between the

PBAC and the WME was not entirely independent and that the exchange between

Jameson and WME regarding the language in the report is evidence that WME was

controlled by PBAC.  The Court disagrees.  As described above, Jameson asked that

WME clarify its report as to whether or not Emery would be considered "disabled"

under the Plan because of her use of Zoloft.  In the first version of the WME report,

the doctors clearly found that Emery was not disabled other than "if the

40

administration of [Zoloft] prevents the pilot from performing her duties." AA665. "[T]he only reason at this time and from January 31, 2007 forward for this pilot to be considered disabled, is the fact that she is taking [Zoloft], even though over the years of treatment this medication does not appear to have been of significant [sic]." AA664 (emphasis added). Nothing said by Jameson convinced the WME doctors to alter that conclusion in any substantive manner and, in the context of the full WME report, it is not clear that the revisions prompted by communication from Jameson were significant. From their initial report to the third and final version of the WME report, it is clear that the WME doctors did not find that the record supported a finding that Emery had an "illness or injury" which met the terms of the Plan.

In a further effort to support her argument that the WME was controlled improperly by Defendant, or that the decision rendered by Defendant was arbitrary and capricious, Plaintiff has asked that this Court grant permission for Plaintiff to introduce "new" evidence: a statement from Dr. Grant as to whether she recalls being consulted for the changes in the WME report. Defendant objects to the introduction of such evidence. The Court finds that even if the evidence is "new," it is not persuasive. Dr. Grant simply states that, to the best of her knowledge, she was not consulted for the changes made to the report after September 21, 2007. Such evidence is insufficient to establish that a conflict of interest exists, nor does it suggest that the decision was arbitrary and capricious. As Plaintiff has failed to establish a basis for admission of such evidence at this time, Plaintiff's Motion for leave to file this evidence is DENIED.

41

Finally, although the Court has not concluded that Emery has demonstrated that a conflict of interest was present, the Court has, in an abundance of caution, reviewed the evidence with a careful regard to any possible taint of bias or self-interest.  The record does not reflect that Defendant suffers from a conflict of interest, or even if any such conflict does exist, it is so minimized by the Plan's structure and the reliance on WME, so as not to be significant.[50]

In conclusion, when faced with divergent medical opinions, this Court is not inclined to find that an ERISA Administrator abused their discretion, particularly when the decision involves an assessment of an individual's psychological health.  And even if the Court had found that a conflict of interest existed, I still must give deference to the Plan administrator's "discretionary decision-making" as a whole.  Doyle v. Liberty Life Assurance Co., 542 F.3d 1352, 1360 (11th Cir. 2008).  Whether or not this Court agrees with the Defendant's conclusion as to Emery's claim for disability benefits, the burden is Emery's to show that the decision against her was arbitrary and capricious or an abuse of the discretion granted to the Plan

---

[50]Emery argues that Defendant was interested in saving money - an unremarkable proposition, of course - and that Defendant improperly denied Emery's claim in order to realize cost savings.  Emery offers, as evidence, a report provided by Defendant that appears to reflect nurse case management savings as a result of denied claims for benefits.  There is no evidence that such report was in the possession of any decisionmaker as to Emery's claim; moreover, the report was not even in existence at the time Emery's benefits were denied in January 2007, nor could it have been reviewed by WME in September 2007.  The reports submitted by Emery are at ECF No. 162; one report is titled "PBAC Disposition 11/30/10," and the other is titled "Pilot Disability - October 2007."

Administrator, and Emery has failed to do so.[51]

### The delay in responding to Emery's request for documents

In Count II of her Complaint, Emery claims that Defendant violated ERISA by refusing to timely provide her with a copy of the Plan description in response to her request on March 3, 2007, Complaint, ¶¶ 14, 26-28.  According to Section 1132 of ERISA, a plan administrator may be liable for a fine if the administrator does not timely (within thirty days) comply with a plan participant's request for information "which such administrator is required by this title to furnish to a participant."  29 U.S.C. § 1132 (c)(1)(B).  In addition, 29 U.S.C. 1024(b)(4) provides that a plan administrator shall furnish a copy of the latest updated summary plan description "upon written request of any participant or beneficiary."

According to Emery, after Dr. Bettes initially terminated Emery's disability benefits in January 2007, Emery sent a letter to American on March 3, 2007, requesting copies of "all documents, records, and other information relevant to the termination of my disability benefits." AA502.  Defendant denies receiving that letter in March 2007.  Emery's request for information was broad, in that she asked for everything relevant to her termination of benefits; while she did not explicitly request a copy of the Plan, she did request "copies of established procedures for the

---

[51]Even if the Defendant's decision was "*de novo* wrong," Emery bears the burden of showing that Defendant's decision was arbitrary and capricious.  Herring v. Aetna Life Ins. Co., 517 Fed. Appx. 897 (11th Cir. April 29, 2013).

verification of a disability as it relates to the Plan/Program." Id.

In an email to her union representative, dated August 13, 2007, Emery provided a copy of the March 2007 letter, and she copied Dr. Bettes on that message. AA87 (found at ECF No. 117-8). The administrative record includes a copy of Emery's letter which is marked "RECEIVED AUG 17 2007." AA502. In addition, Defendant has provided a copy of handwritten notes, prepared by Jameson, dated November 13, 2007, which state: "Please send [Emery] copies of her disability claim file .... She called me last Thursday (Nov 8) advising that she never got this info, although she requested it from Employee Services." AA126 (found at ECF No. 117-14). American admits that it did not provide Emery with a copy of the Plan description until January 23, 2008, in response to Emery's letter of January 16, 2008.

According to ERISA, if a covered employee makes a written request for a copy of the plan to her plan administrator, the plan administrator is required to provide a copy of the plan description within 30 days. If the employer fails to do so, the employer can be penalized up to $110 per day of non-compliance. 29 U.S.C. § 1132(c); 29 C.F.R. 2575.502c-1. In Daughtrey v. Honeywell, Inc., 3 F.3d 1488 (11th Cir. 1993), the ERISA administrator had delayed by one year in responding to a plan participant's request for a statement of benefits. Although the administrator offered no explanation for the delay, the lower court declined to impose a penalty. The appellate court reversed the decision and directed that an appropriate penalty be imposed. Daughtrey, 3 F.3d at 1494-95.

I have reviewed the letter sent by Emery in March 2007 and find that the request was sufficiently specific to have triggered an obligation by American - if the letter had been received. Indeed, the text in the letter is nearly identical to the language found in the Summary Description of the Plan, where instructions are provided to Plan participants. AA504.[52] And, Emery properly addressed the letter to Defendant's department of "Employee Services" as she was directed to do by her union representative. AA503. It is undisputed that Defendant received a copy of the March 2007 letter at least as of August 17, 2007.

In light of the disturbing[53] failure of Defendant to respond timely to Emery's request, which Defendant received at least as of August 17, 2007, the Court has determined that a fine in the amount of **$14,080** shall be imposed. This sum represents the maximum allowable fine of $110 per day for each of 128 days from September 16, 2007, through January 22, 2008. The Court does not, however, find that this is a basis on which to award to Plaintiff her attorney's fees. According to 29 U.S.C. § 1132(g)(1), the decision as to attorney's fees and costs is in this Court's

---

[52]Moreover, the text of the letter is nearly identical to the text of the letter sent in January 2008, to which Defendant responded promptly. On January 22, 2008, Jameson informed Emery that American would send her the relevant documents and that "a copy of the Summary Plan Description for this benefit plan is available to you via Jetnet." In other words, as of January 22, 2008, American Airlines construed Emery's request as a request for a copy of the Plan.

[53]Emery has not demonstrated that she was prejudiced by the Defendant's failure to timely provide a copy of the Plan to Emery. While the lack of demonstrable prejudice is not a controlling factor, it can be considered as a factor in the exercise of discretion. Byars v. Coca-Cola Co., 517 F.3d 1256 (11th Cir. 2008).

discretion, and I am exercising that discretion to deny Plaintiff's request for attorney's fees.  In addition, Defendant, in its Answer and Affirmative Defenses, requested its attorney's fees; that request is DENIED.

<u>CONCLUSION</u>

The Court has reviewed the administrative record and the evidence presented by the parties, and finds that Emery has failed to establish that the Defendant's decision was arbitrary and capricious.  The Court finds that there were reasonable grounds for the Defendant's decision to deny Emery's claim for benefits, even though there is some evidence contrary to Defendant's ultimate determination as to Emery's disability; moreover, Emery has failed to demonstrate sufficient evidence of a bias in Defendant's approach to her claim, nor has she demonstrated that any conflict under which American Airlines may have operated resulted in an abuse of discretion in the decision to deny Emery's appeal.

In light of the above, even if the Court were to find that the decision to deny disability benefits to Emery was wrong, the Court would not be able to find that Defendant's decision was subject to reversal.  The Court has determined, however, that the Defendant is liable for a civil penalty in the amount of $14,080 for the failure to timely provide Emery with a copy of the Plan.  Based on the above, it is

ORDERED AND ADJUDGED that the Defendant's Motion for Summary Judgment is GRANTED, in part.  Defendant is entitled to Summary Judgment as to Counts I, III, and IV of the Complaint.  Plaintiff's Motion for Judgment is

GRANTED, in part - Plaintiff is entitled to judgment in the amount of $14,080 as to her claim in Count II of the Complaint; in all other respects Plaintiff's motion is DENIED.  Attorney's fees are DENIED as to both parties.

Final judgment will be issued by separate order on this date.

DONE AND ORDERED in Chambers in Miami this 20th day of October 2014.

_____
WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT COURT JUDGE

Copies to:    counsel of record

47